**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sandra Bronick, a single woman, | No. CV-11-01442-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| State Farm Mutual Automobile Insurance Company; et al., | |
| Defendants. | |

Pending before the Court is Defendants' Motion for Partial Summary Judgment (the "Motion"). (Doc. 65). Defendants have filed a Separate Statement of Facts in Support the Motion. (Doc. 66). Plaintiff has filed a Response to the Motion (Doc. 68) and a Separate Controverting Statement of Facts (Doc. 69). Defendants have also filed a Reply. (Doc. 70). For the following reasons, Defendant's Motion will be granted.

**I.     BACKGROUND**

Plaintiff Sandra Bronick was injured in a rear-end automobile collision on December 17, 2009. (Doc. 1-2 at 1). The car Plaintiff was riding in was hit from behind and Plaintiff was not at fault for the accident. The at-fault driver was insured by United Services Automobile Association ("USAA"). (Doc. 66 at 2). Immediately following the accident, Plaintiff was treated for head, neck, right hip, and back injuries. (*Id*.). Five days after the accident, on December 22, 2009, Plaintiff informed her insurer, Defendant State Farm Mutual Automobile Insurance Company ("State Farm" or "Defendant") that she planned to follow up with her primary care physician regarding ankle pain. (*Id*.). On the

same day, Plaintiff saw her primary care physician and complained of right ankle pain for the first time. (Doc. 69-1 at 48).

On February 11, 2010 Plaintiff saw Danton S. Dungy, M.D. ("Dr. Dungy"), for an evaluation of her right ankle. (Doc. 69 at 6). In the course of his evaluation, Dr. Dungy found an abnormal lump in Plaintiff's right Achilles tendon. (*Id*.). Dr. Dungy ordered an MRI of the tendon that revealed tendinosis and peroneal tendinosis. (*Id*.). On March 4, 2010, Dr. Dungy put Plaintiff in a Cam walker to wear for four to six weeks and instructed her to follow up at that time. (*Id*.). On March 16, 2010, Plaintiff saw Dr. Dungy again because she felt a sharp pain in her right ankle. (*Id*.). Dr. Dungy ordered an ultrasound and placed Plaintiff in a four-wheeled walker. (*Id*.). Over a month later, on April 23, 2010, another MRI was taken of Plaintiff's right ankle and it revealed a full thickness rupture of her Achilles tendon. (*Id*.). On May 3, 2010, Dr. Dungy surgically repaired Plaintiff's right Achilles tendon, and Plaintiff was hospitalized until May 5th. (*Id*. at 6-7).

Approximately one month later, Plaintiff re-tore her Achilles tendon. (*Id*. at 7). Plaintiff underwent a second surgery on June 21, 2010, and was hospitalized until June 24th. (*Id*.).

On December 9, 2010, Dr. Dungy wrote a letter to Plaintiff's counsel, Matthew Riggs ("Riggs"), explaining that in his opinion, the motor vehicle accident did contribute to the tear of Plaintiff's Achilles tendon. (Doc. 69 at 6).

Ultimately, Plaintiff received $100,000 in compensation from USAA for her injuries due to the accident. (Doc. 66 at 5). However, Plaintiff alleged that the amount she received was insufficient to compensate for her damages. On January 26, 2011, Plaintiff's counsel advised Defendant's claim representative, Rick Santilli ("Santilli"), that Plaintiff was claiming a torn Achilles tendon as a result of the accident and that she would be requesting additional compensation from Defendant through her Underinsured Motorist ("UIM") coverage. (*Id*. at 4). During the phone call, Santilli questioned the mechanism for an Achilles tendon injury in a rear-end automobile accident. (*Id*.).

On March 14, 2011, Santilli received Plaintiff's UIM policy limit demand letter

and package containing all of Plaintiff's medical records.  (*Id*.).  Plaintiff claimed that to date, her medical expenses totaled $112,676.37.  (*Id*.).  Of this amount, expenses associated with Plaintiff's Achilles tendon injury were $100,279.02.  These expenses included $65,334.19 in hospital bills for the surgeries, $19,944.83 for rehabilitation following the surgeries, and $15,000 for diagnostic studies and treatment from Dr. Dungy.  (*Id*. at 5).

On March 21, 2011, Santilli began evaluating Plaintiff's medical records.  (*Id*.).  In notes that were apparently made that same day, Santilli noted "Dungy MD sent IA Riggs a letter opine that MVA caused Rt ankle injury.  Hlly Q'ble medical conclusion in lite of all the evidence to the contrary.  Need several hours to thoroughly review all records and bills sent to prepare an eval."  (Doc. 69-1 at 29).

On March 30, 2011, Santilli completed his review of Plaintiff's medical records.  (Doc. 66-1 at 36-47).  Santilli still remained skeptical of the cause of Plaintiff's Achilles tendon injury.  Following the evaluation of Plaintiff's medical records Santilli noted "I question the mechanism for a torn RT Achilles heel tendon in this R/E impact, despite [Plaintiff's] description of pressing her foot against the floorboard.  R/E impact would remove pressure/stress from the ankle and knee joints."  (*Id*. at 46).  Santilli further noted that prior to the accident Plaintiff had been diagnosed with diabetes and had chronic tendinosis in her right Achilles tendon and that immediately following the accident Plaintiff did not report ankle pain to the paramedics or to the emergency room personnel.  (Doc. 66 at 6).  Plaintiff did not report ankle pain until five days after the accident.  (*Id*.).  Finally, Santilli noted that Defendant may need Plaintiff to attend an independent medical examination ("IME") as part of the investigation regarding the cause and nature of Plaintiff's Achilles tendon injury.  (*Id*.).

On May 19, 2011, Plaintiff attended an IME with Douglas P. Hartzler, M.D. ("Dr. Hartzler").  In his IME report, Dr. Hartzler notes the medical records he reviewed in conjunction with the examination and summarized Plaintiff's medical history both before and after the automobile accident.  (Doc. 66-1 at 49).  Based upon his examination and his

review of Plaintiff's medical records, Dr. Hartzler concluded that Plaintiff sustained soft tissue injuries as a result of the accident, which included cervical strain and right shoulder strain. (*Id*. at 54-55). He also opined that Plaintiff aggravated degenerative conditions involving her knees. (*Id*.). With respect to Plaintiff's Achilles tendon, Dr. Hartzler concluded that the mechanism for injury was an eccentric load. (*Id*.). Based upon his review of three different MRIs performed of Plaintiff's right ankle, Dr. Hartzler concluded that Plaintiff has chronic tendinosis of the Achilles tendon and sustained a spontaneous rupture with minimal trauma in April of 2010, which was approximately four months after the accident. (*Id*.). He further concluded that the mechanism of injury as well as timing would suggest no contribution from the automobile accident. (*Id*.). According to Dr. Hartzler, even if Plaintiff aggravated a preexisting degenerative condition in the Achilles tendon, this would resolve quickly over 8 to 12 weeks. (*Id*.). Finally, Dr. Hartzler noted that he has participated in orthopedic level I trauma for the past 25 years and has never seen an Achilles tendon rupture as a result of a motor vehicle accident, even in ones that involved high speed front end collisions. (*Id*.).

On May 27, 2011, Santilli received and reviewed Dr. Hartzler's report and mailed a copy to Plaintiff's counsel. (Doc. 66 at 8). Following his review of Dr. Hartzler's report, Santilli amended his evaluation dated March 30, 2011, and he included a detailed summary of Plaintiff's medical history before and after the accident. (*Id*.). Santilli concluded that the automobile accident did not cause or contribute to Plaintiff's Achilles tendon injury. (*Id*.). Santilli valued Plaintiff's total bodily injury claim between $24,000 and $30,000 from the accident and determined that Plaintiff had been fully compensated by USAA's $100,000 policy limit payment. (*Id*.).

On May 31, 2011, Santilli sent a letter to Plaintiff's counsel confirming that Defendant had considered all of the information available relating to Plaintiff's UIM claim and informing counsel that Defendant would be denying the claim. (*Id*. at 9). Following Defendant's denial of her UIM claim, Plaintiff commenced this action in Maricopa County Superior Court on June 7, 2011, alleging two counts against Defendant: breach of contract

1  and breach of duty of good faith and fair dealing.  (Doc. 1-2 at 2-3).  On July 20, 2011,

2  Defendant filed a notice of removal to the United States District Court for the District of

3  Arizona.  (Doc. 1 at 1).  Following discovery, on November 12, 2012, Defendant filed the

4  pending Motion for Partial Summary Judgment.  (Doc. 65).

5  **II.    LEGAL STANDARD**

6       Defendant contends that the Court should grant summary judgment in favor of

7  Defendant on Plaintiff's claim that State Farm breached its duty of good faith and fair

8  dealing because there is no evidence to support Plaintiff's claim.  (*Id*. at 1).

9       **A.    Summary Judgment**

10      Summary judgment is only appropriate when "the movant shows that there is no

11  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

12  law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely

13  disputed must support that assertion by . . . citing to particular parts of materials in the

14  record," or by "showing that materials cited do not establish the absence or presence of a

15  genuine dispute, or that an adverse party cannot produce admissible evidence to support the

16  fact."  *Id*. 56(c)(1)(A)&(B).  Thus, summary judgment is mandated "against a party who

17  fails to make a showing sufficient to establish the existence of an element essential to that

18  party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*

19  *v. Catrett*, 477 U.S. 317, 322 (1986).

20      Initially, the movant bears the burden of pointing out to the Court the basis for the

21  motion and the elements of the causes of action upon which the non-movant will be unable

22  to establish a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the non-

23  movant to establish the existence of material fact.  *Id*.  The non-movant "must do more

24  than simply show that there is some metaphysical doubt as to the material facts" by

25  "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"

26  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting

27  Fed. R. Civ. P. 56(e) (1963) (amended 2010)).  In the summary judgment context, the

28

1    Court construes all disputed facts in the light most favorable to the non-moving party.

2    *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

3        The mere existence of some alleged factual dispute between the parties will not

4    defeat an otherwise properly supported motion for summary judgment; the requirement is

5    that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

6    242, 247-248 (1986).  A material fact is any factual issue that might affect the outcome of

7    the case under the governing substantive law.  *Id*. at 248.  A material fact is "genuine" if

8    the evidence is such that a reasonable jury could return a verdict for the non-moving party.

9    *Id*.

10       At the summary judgment stage, the trial judge's function is to determine whether

11   there is a genuine issue for trial.  There is no issue for trial unless there is sufficient

12   evidence favoring the non-moving party for a jury to return a verdict for that party.  *Id*. at

13   249-250.  If the evidence is merely colorable or is not significantly probative, the judge

14   may grant summary judgment.  *Id*.

15       **B.     Bad Faith**

16       Arizona courts acknowledge that, "in buying insurance an insured usually does not

17   seek to realize a commercial advantage but, instead, seeks protection and security from

18   economic catastrophe."  *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986) (citations

19   omitted).  Although insurers do not owe fiduciary duties to their insureds, they do owe

20   them some duties of a fiduciary nature; including, the duties of equal consideration,

21   fairness, and honesty.  *Zilisch v. State Farm Mut. Auto. Ins. Co*., 995 P.2d 276, 279 ¶ 20

22   (Ariz. 2000).  One of the benefits that flows from a first-party insurance contract, "is the

23   insured's expectation that his insurance company will not wrongfully deprive him of the

24   very security for which he bargained or expose him to the catastrophe from which he

25   sought protection.  Conduct by the insurer which does destroy the security or impair the

26   protection purchased breaches the implied covenant of good faith and fair dealing implied

27   in the contract."  *Rawlings*, 726 P.d at 571.

28       Insurers must play fairly with their insureds.  *Zilisch*, 995 P.2d at 279 ¶ 20.  An

- 6 -

insurer breaches the implied covenant of good faith and fair dealing and acts in bad faith when it, "intentionally denies, fails to process or pay a claim without a reasonable basis." *Id*. (quoting *Noble v. Nat'l Am. Life Ins. Co*., 624 P.2d 866, 868 (Ariz. 1981)).   Under Arizona law, a plaintiff establishes bad faith on the part of the insurance company by showing that the insurer acted unreasonably.   The test for reasonableness contains two elements.   A plaintiff must show that (1) the insurer acted unreasonably *and* (2) either knew or was conscious of the fact that its conduct was unreasonable.   *Milhone v. Allstate Ins. Co*., 289 F. Supp. 2d 1089, 1094 (D. Ariz. 2003); *Deese v. State Farm Mutual Auto. Ins. Co*., 838 P.2d 1265, 1268 (Ariz. 1992) (en banc).   This "first prong of the test for bad faith is an objective test based on reasonableness.   The second prong is a subjective test, requiring the plaintiff to show that the defendant insurance company committed consciously unreasonable conduct."   *Milhone*, 289 F. Supp. 2d at 1094 (citing *Trus Joist Corp. v. Safeco Ins. Co. of Am*., 735 P.2d 125, 134 (Ariz. Ct. App. 1986)).

To determine bad faith, the Court then applies this reasonableness test to two separate inquiries.   First, the Court applies the elements that make up the reasonableness test to a consideration of whether the claim was "fairly debatable."   *Id*. (quoting *Deese*, 838 P.2d at 1268); *see also Trus Joist Corp*., 735 P.2d at 134 ("[T]he . . . 'fairly debatable' test[ ] at issue here encompass the [objective and subjective] elements, each being merely a shorthand method for applying the law of bad faith to different breaches of the overall duty of good faith.").   Second, the Court applies this reasonableness test to a consideration of how the insurer handled the claims handling process.   *Zilisch*, 995 P.2d at 280 ¶ 22 (citing *Noble*, 624 P.2d at 868) ("The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that *in the investigation, evaluation, and processing of the claim*, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." (emphasis added)).   Thus, an insurance company can be liable for bad faith for either unreasonably denying a claim that was not fairly debatable or for acting unreasonably in how it processd a claim whether the claim was fairly debatable or not.

## 1. Fair Debatability

To determine fair debatability, the Court first looks to whether the insurer's actions were objectively reasonable.   "[I]n defending a fairly debatable claim, an insurer must exercise reasonable care and good faith."  *Zilisch*, 995 P.2d at 279 ¶ 19.  If the insurer acted objectively unreasonably, then the Court moves to the subjective inquiry and determines if the insurer knew or was conscious that its conduct was unreasonable.  *Trus Joist Corp.*, 735 P.2d at 134 ("[T]he . . . 'fairly debatable' test[ ] at issue here encompass the [objective and subjective] elements, each being merely a shorthand method for applying the law of bad faith to different breaches of the overall duty of good faith.").  If the insurer either acted reasonably or did not know that its conduct was unreasonable then the claim was fairly debatable.

"The first element is clearly an objective test based upon a simple negligence standard: did the insurance company act in a manner consistent with the way a reasonable insurer would be expected to act under the circumstances."  *Id.*  "This is the threshold test for all bad faith actions."  *Id.*

Under the second element in determining fair debatability, the Court looks to whether the insurer's actions were subjectively reasonable.  "It is this second, subjective, element of knowledge that elevates bad faith to a quasi-intentional tort."  *Trus Joist Corp.*, 735 P.2d at 134.   Thus, Plaintiff must offer evidence that shows that the insurance company committed "consciously unreasonable conduct."  *Id.*  "Consciously unreasonable conduct" requires that the insurance company either acted knowing it was acting unreasonably or acted with sufficiently reckless disregard of the fact that it did not have a reasonable basis for denying the claim that knowledge can be imputed to it.  *Id.*

Generally, "[w]hile an insurer may challenge claims which are fairly debatable, . . . its belief in fair debatability 'is a question of fact to be determined by the jury.'"  *Zilisch*, 995 P.2d at 279 ¶ 20 (quoting *Sparks v. Rep. Nat'l Life Ins. Co.*, 647 P.2d 1127, 1137 (Ariz. 1982)).  Normally, this would preclude the Court from granting summary judgment in a bad faith claim to a defendant insurer that had first acted objectively unreasonably

1    because the second element of the reasonableness test to establish fair debatability is only

2    for the trier of fact to determine.  However, as this Court has previously noted and the

3    Ninth Circuit Court of Appeals has affirmed, "if the plaintiff offers no significantly

4    probative evidence that calls into question the defendant's belief in fair debatability . . . the

5    court may rule on the issue as matter of law."  *Young v. Allstate*, 296 F. Supp. 2d 1111,

6    1116 (D. Ariz. 2003) (citing *Knoell v. Metro. Life Ins. Co.*, 163 F. Supp. 2d 1072, 1077 (D.

7    Ariz. 2001) ("[B]ecause there are no questions of fact to present to a jury about whether the

8    insurance company really believed it should investigate the claim verses just using the

9    investigation as a pretext to avoid payment, this Court concludes that the Defendant did not

10   act in bad faith by investigating the claim.")); *see also Prieto v. Paul Revere Life Ins. Co.*,

11   354 F.3d 1005, 1010 (9th Cir. 2004) (even after *Zilisch*, the Court may determine fair

12   debatability as a matter of law if a plaintiff has failed to raise a genuine issue of material

13   fact regarding debatability).   Therefore, if Defendant's conduct was first objectively

14   unreasonable, to prove the claim was not fairly debatable as a matter of law, Plaintiff must

15   then present enough evidence to raise a material question of fact regarding Defendant's

16   knowledge that its conduct was unreasonable.

17         In this case, the only issue for consideration in Plaintiff's bad faith claim is

18   Defendant's determination of causation.  Specifically, the central question is whether the

19   claim was fairly debatable at all or whether Defendant acted in bad faith in how it reached

20   its conclusion that the accident did not cause Plaintiff's Achilles tendon injury.

21         The Court finds Plaintiff's UIM claim was fairly debatable.  Plaintiff has failed to

22   offer any significantly probative evidence that calls into question Defendant's belief in fair

23   debatability.   Plaintiff's arguments for how Defendant acted in bad faith focus on how

24   Defendant handled Plaintiff's UIM claim and whether Defendant acted unreasonably in the

25   claims handling process.  While Plaintiff uses the term of art "fair debatability" in making

26   these arguments, no evidence has been offered to show that the UIM claim itself was not

27   fairly debatable.  Accordingly, the Court finds as a matter of law that the claim was fairly

28   debatable because Plaintiff has offered no evidence to the contrary.

**2.  Claims Handling**

While fair debatability is a necessary condition for a defendant insurer to prevail on a motion for summary judgment in a bad faith claim, fair debatability is not a sufficient condition for the insurer to avoid liability for bad faith.  *Zilisch*, 995 P.2d at 280 ¶ 22. Even if the Court finds fair debatability existed, the insurer could still be liable for bad faith based on its actions during the claims handling process.  In other words, even if Defendant is not liable for bad faith because the claim is fairly debatable, Defendant may still be liable for bad faith if Defendant acted unreasonably in processing the claim.  *Id.* at 280 ¶ 20, ¶ 21 ("if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith . . . ," "[t]he court of appeals therefore erred in concluding that fair debatability is both the beginning and the end of the analysis"); *compare Lasma Corp.*, 764 P.2d at 1122 ("the tort [of bad faith] will not lie for claims which are 'fairly debatable'"), *with Zilisch*, 995 P.2d at 280 ¶ 22 ("as we have held, while fair debatability is a necessary condition to *avoid* a claim of bad faith, it is not always a sufficient one") (emphasis added).  An insurer must immediately conduct an adequate investigation and act reasonably in evaluating a claim.  *Id*. at 280 ¶ 21.

In *Zilisch*, the Arizona Supreme Court held that the plaintiff presented enough evidence for a jury to have found that the insurer acted unreasonably in the course of its claims handling process and knew it.  *Id*. at 280 ¶23.  The plaintiff proffered evidence that the defendant insurer set arbitrary goals companywide for the reduction of claims paid and the salaries and bonuses paid to claims representatives were influenced by how much the representatives paid out on claims.  *Id*; *see also Hawkins v. Allstate Ins. Co*., 733 P.2d 1073, 1082 (Ariz. 1987) (past practices relevant and admissible).  Further, the Arizona Supreme Court held that reasonable jurors could have found that the insurer dragged out the claims handling process and took an unreasonable length of time to evaluate the claim. *Id*.  In spite of having all available and relevant records, the insurer unjustifiably waited approximately ten months to settle the claim from when the insurer received the claimant's demand.  *Id*.  The Arizona Supreme Court found the trial court was correct in submitting

1   plaintiff's bad faith claim to the jury due to this evidence.  *Id*. at 281 ¶ 25.

2          In this case, the Court finds Defendant acted as a reasonable insurer would be
3   expected to act under the circumstances by timely reviewing the claim, by hiring a
4   qualified physician to make an independent medical evaluation, and by using that
5   evaluation to make the final determination.

6          Defendant first learned of Plaintiff's Achilles tendon injury in a phone call with
7   Plaintiff's counsel on January 26, 2011.  (Doc. 66 at 4 ¶ 11).  Counsel informed
8   Defendant's claim representative, Santilli, that Plaintiff would be making a UIM claim for
9   a torn Achilles tendon as a result of the accident.  (*Id*.).  Santilli requested that counsel
10  provide property damage information, proof of USAA's liability limits, and Plaintiff's
11  medical records.  (*Id*.).  During the phone call and prior to reviewing any records, Santilli
12  also questioned the mechanism for an Achilles tendon injury in a rear-end automobile
13  accident. (*Id*.).

14         Santilli received Plaintiff's UIM claim on March 14, 2011.  (*Id*. at ¶ 12).  Plaintiff's
15  UIM claim contained all of Plaintiff's relevant medical records including those from the
16  physician that treated her for her torn Achilles tendon (*id*. at 5 ¶ 14); the expenses
17  specifically associated with Plaintiff's Achilles tendon injury (*id*. at ¶ 13); and a declaration
18  from USAA that Plaintiff had already been paid $100,000 for her injuries (*id*. at ¶ 14).

19         On March 21, 2011, Santilli began reviewing Plaintiff's medical records.  (*Id*. at 5 ¶
20  15).  In notes that were apparently made that same day, Santilli noted,

21                 Dungy MD sent IA Riggs a letter opine that MVA caused Rt
22                 ankle injury.  Hlly Q'ble medical conclusion in lite of all the
                   evidence to the contrary.  Need several hours to thoroughly
23                 review all records and bills sent to prepare an eval.

24  (Doc. 69-1 at 29).  On March 30, after reviewing all of Plaintiff's medical records, Santilli
25  noted, "I question the mechanism for a torn RT Achilles heel tendon in this R/E impact,
26  despite [Plaintiff's] description of pressing her foot against the floorboard.  R/E impact
27  would remove pressure/stress from the ankle and knee joints." (*Id*. at 46).  Further, Santilli
28  noted that prior to the accident Plaintiff had been diagnosed with diabetes and had chronic

1    tendinosis in her right Achilles tendon and that immediately following the accident

2    Plaintiff did not report ankle pain to the paramedics or to the emergency room personnel.

3    (Doc. 66 at 6).  Plaintiff did not report ankle pain until five days after the accident.  (*Id.*).

4    Finally, Santilli noted that Defendant may need Plaintiff to attend an IME with Dr. Hartzler

5    as part of the investigation regarding the cause of Plaintiff's Achilles tendon injury.  (*Id.*).

6         Following Dr. Hartzler's IME and after reading Dr. Hartzler's report, Santilli

7    finished his evaluation and denied Plaintiff's UIM claim.  At no time did Santilli discuss

8    Plaintiff's condition or injuries with either Plaintiff or Dr. Dungy.

9         Plaintiff essentially makes three arguments for how Defendant acted unreasonably

10   in the processing of Plaintiff's claim.   First, Plaintiff argues that Santilli made a

11   determination of Plaintiff's claim before reviewing any of the medical evidence and

12   tailored his evaluation of Plaintiff's claim to meet his initial determination.   Second,

13   Plaintiff argues that the hiring of Dr. Hartzler at all to perform the IME is enough evidence

14   of bad faith for the trier-of-fact to make the final determination.  Third, Plaintiff argues that

15   Santilli's failure to speak with either Plaintiff or Dr. Dungy during the course of his

16   evaluation is evidence of bad faith.  (Doc. 68 at 11).

17                    **a.  Santilli's Statement and Note**

18        Plaintiff argues that Defendant "dubiously questioned [Plaintiff's] injuries and the

19   causal relationship to the accident *ab inicio* [sic], [and] shap[ed] its evaluation around that

20   position."  (Doc. 68 at 10).  However, Santilli's statement to Plaintiff's counsel and his

21   note made on March 21 were not pre-review determinations of Plaintiff's claim, they were

22   merely questions regarding Plaintiff's claim that Santilli answered throughout the course of

23   his investigation.

24        Santilli's statement to Plaintiff's counsel is not evidence of unreasonable conduct

25   and, therefore, not evidence of bad faith.  While Santilli's statement was clearly made prior

26   to reviewing Plaintiff's medical records, the statement was merely an observation and not

27   an unreasonable observation under the circumstances.  Plaintiff offered no evidence that

28   Santilli acted unreasonably in evaluating and investigating Plaintiff's claim after making

1    the statement.

2          Santilli's note made on March 21, 2011, is also not evidence of unreasonable

3    conduct.  Plaintiff's central argument concerning the note is that it was made prior to

4    reviewing any medical evidence and therefore evinces an unreasonable denial of Plaintiff's

5    claim.  (Doc. 68 at 10).  The note, however, was clearly not made *prior* to any review of

6    the medical records in spite of Plaintiff's claim to the contrary.  In his evaluation notes,

7    preceding the note at issue where he questioned Dr. Dungy's opinion, Santilli explicitly

8    refers to Plaintiff's medical records and notes,

9
10                 tried to go thru sev demand images, relabeled, bookmarked
                   some pertinent items.  Amb[ulance] crew noted minimal
11                 damage, no ankle or extremity complaints.  Same for ER, as
                   of 1/8/10 Ortho still had not documented any Rt Ankle Sx, let
12                 alone due to this MVA.

13   (Doc. 66-1 at 12).  Further, the note at issue expressly references, "in lite of all the

14   evidence to the contrary."  (*Id*.).  This is direct evidence that Santilli was reviewing and

15   had reviewed at least some of the medical evidence prior to making the note at issue.

16   While Santilli did not complete his review of Plaintiff's medical records until March 30,

17   2011, the note in question was made during the course of his investigation and was not

18   made prior to reviewing any of Plaintiff's medical records.  Given the circumstances, that

19   Plaintiff was claiming an uncommon injury after a read-end motor vehicle accident,

20   Defendant acted as any reasonable insurer would be expected to act.  The note is not

21   evidence of unreasonable conduct on Santilli's part.  The Court finds Defendant did not act

22   in bad faith by questioning and ultimately denying Plaintiff's UIM claim.

23                          **b.  The Hiring of Dr. Hartzler**

24          Plaintiff claims that the hiring of Dr. Hartzler is evidence in and of itself that

25   Defendant knew its conduct was unreasonable.  (*Id*. at 11, 12).  Specifically, Plaintiff

26   argues that Defendant intentionally hired Dr. Hartzler to prepare an "unfair" IME report.

27   (*Id*. at 12).  This "evidence," however, is no more than an accusation.  The fact that Dr.

28   Hartzler disagrees with the conclusion of Plaintiff's treating doctor does not amount to bad

1  faith.

2      At oral argument on May 15, 2013, Plaintiff's counsel conceded that due to the

3  nature of insurance claims there are physicians that both plaintiffs and defendant insurers

4  regularly hire to perform medical evaluations.  In his testimony, Dr. Hartzler also explained

5  this when he testified that he is available to perform examinations at the request of both

6  plaintiffs and defendants, but the nature of the business is that plaintiffs typically do not

7  request an IME to be performed because they have already been evaluated and treated by

8  their own treating physicians.  (Doc. 69-1 at 66).  Further, Plaintiff's counsel conceded that

9  among these physicians that both plaintiffs and defendant insurers use for medical

10  examinations a number of these physicians consistently arrive at favorable conclusions for

11  the parties that hire them.  Plaintiff's counsel argued that "equal consideration" under the

12  law of bad faith should mean that Defendant had an obligation to seek out a physician to

13  perform the IME that would be "unbiased."

14      "Unbiased" under Plaintiff's definition, however, means a physician that has not

15  reached favorable findings for a defendant insurer more often than for a plaintiff.  The

16  Court finds Plaintiff's definition of unbiased misleading.   Plaintiff attempts to show Dr.

17  Hartzler was "biased" by using the report of Plaintiff's Expert, Attorney Frederick C. Berry

18  ("Berry").  (Doc. 68 at 4-5).  Berry's report, however, makes this characterization of being

19  "biased" by circumstantial statistical evidence alone.  The basis for Plaintiff's allegation

20  and Berry's conclusion that Dr. Hartzler was biased is merely statistical evidence that

21  shows Dr. Hartzler has performed 151 IME's and Berry concludes that only five of them

22  favored the patients and showed their injuries and treatments were justified causally to the

23  subject accidents.  (*Id.*).

24      This statistic is wholly irrelevant to the facts of Plaintiff's case.  Berry's report does

25  not attempt to look at the facts of each of those 151 cases.  Berry's report does not answer

26  in how many of those cases Dr. Hartzler reached an unfair and biased conclusion for a

27  defendant insurer.   Berry's report attempts to present the jury with irrelevant and

28  misleading evidence.  The relevant question is whether Dr. Hartzler was unfair and biased,

1    not how many times Dr. Hartzler was hired or how many times he reached a favorable

2    conclusion for a defendant insurer absent the unique facts of each case.  Berry's report is

3    irrelevant on the issue of whether Dr. Hartzler was biased with no evidence that Dr.

4    Hartzler has acted unfair and biased in the past.

5            Plaintiff's counsel admitted at oral argument that no case in the Ninth Circuit has

6    extended the law of bad faith claims to the point that simply hiring a physician that has

7    reached favorable conclusions for insurers in the past is evidence that a defendant insurer

8    has acted unreasonably and in bad faith.  Plaintiff's counsel explicitly stated at oral

9    argument that he wants the Court to "advance" the law of bad faith claims to make such

10   action by an insurer evidence per se of bad faith.  By arguing that the law should "advance"

11   to support Plaintiff's claim, Plaintiff admits that the law does not currently support

12   Plaintiff's argument.

13           Typically, when a federal Court sits in diversity the Court applies the substantive

14   law of the state in which it is located.

> When interpreting state law, federal courts are bound by
> decisions of the state's highest court.  In the absence of such a
> decision, a federal court must predict how the highest state
> court would decide the issue using intermediate appellate
> court decisions, decisions from other jurisdictions, statutes,
> treatises, and restatements as guidance.  However, where
> there is no convincing evidence that the state supreme court
> would decide differently, a federal court is obligated to follow
> the decisions of the state's intermediate appellate courts.

21   *Vestar Develop. II, LLC, v. General Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001)

22   (quoting *Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir.1996)).

23   (internal quotations and citations omitted).  Plaintiff has offered no examples of case law

24   from this jurisdiction or any other supporting their argument to advance the law and the

25   Court finds no convincing reason to advance the law to such a point.

26           Plaintiff's counsel conceded at oral argument that Defendant had the legal right to

27   hire a physician to perform an IME if Plaintiff made a claim under her UIM policy with

28   Defendant.  Counsel further conceded that Dr. Hartzler was qualified to perform the IME

1    given the fact that he is a board certified orthopedic surgeon with 25 years of experience.

2    In making the argument that Defendant acted unreasonably in hiring Dr. Hartzler,

3    Plaintiff's counsel appears to suggest that under Arizona law, before choosing a physician

4    to perform an IME, Defendant would have been expected to perform an independent

5    analysis similar to the analysis performed by Berry and determine how many times in the

6    past Dr. Hartzler had made findings favorable to defendant insurers.  Plaintiff's counsel's

7    argument logically concludes that armed with this information, Defendant should have then

8    chosen a different physician to perform an IME to make a determination of causation in

9    order to have not acted in bad faith.

10    The issue is causation, and whether the accident caused Plaintiff's Achilles tendon

11    injury.  Plaintiff concedes that Dr. Hartzler is imminently qualified to make such a medical

12    determination.  However, had Defendant done what Plaintiff suggests it should have done,

13    it would still be irrelevant to the ultimate question of whether Defendant hired a biased

14    physician.  As discussed above, whether Dr. Hartzler has found for defendant insurers in

15    the past is irrelevant to whether he is unfair and biased, the central question regarding bias

16    is whether Dr. Hartzler has performed unfair and biased IMEs in the past.   Under

17    Plaintiff's reasoning, Defendant would be expected to do what Berry failed to do in his

18    report, and Defendant would be expected to cull the facts of all 151 prior cases that Dr.

19    Hartzler has been hired to do an IME in and determine whether the facts of each of those

20    cases shows Dr. Hartzler acted unfairly and biased toward a defendant.   As Plaintiff

21    conceded at oral argument the law of bad faith in Arizona has not advanced to this point,

22    where equal consideration places such a burden on a defendant insurer.  Consequently, the

23    duty to give equal consideration does not include such conduct and it was not objectively

24    unreasonable for Defendant to hire Dr. Hartzler.

25    **c.  Hiring Dr. Hartzler without Consulting Plaintiff and Dr.**
26    **Dungy**

27    Finally, Plaintiff argues that hiring Dr. Hartzler without first speaking to Plaintiff or

28    Plaintiff's treating physician, Dr. Dungy, is evidence that Defendant acted unreasonably.

- 16 -

(Doc. 68 at 12).  Plaintiff's counsel fails to explain what Plaintiff would have told Santilli or what Dr. Dungy would have told Santilli had he consulted them prior to hiring Dr. Hartzler and how that would have changed Santilli's determination of causation.

Plaintiff provided Santilli with all of the relevant information in her UIM claim for Santilli to make a thorough evaluation.  At oral argument Plaintiff's counsel argued that had Plaintiff been consulted she would have explained to Santilli that she had no prior symptoms of ankle pain before the accident.  She only had prior underlying conditions. Causation, however, is a medical issue.  What Plaintiff would have told Santilli is no more relevant than what she did tell the physicians making the medical determination.  Plaintiff's counsel has never made the argument that he failed to give Santilli all of Plaintiff's relevant medical records.  Further, there is no allegation that Santilli failed to thoroughly review the medical evidence.

The law of bad faith claims in Arizona has not reached the point where bad faith is evinced when a defendant insurer chooses not speak with a claimant or her treating physician when the insurer possesses all of the relevant medical records.  The Court finds Defendant acted in a manner consistent with the way a reasonable insurer would be expected to act under the circumstances.  Unlike the evidence the plaintiff offered in *Zilisch*, none of the evidence Plaintiff has proffered here rises to the level of showing Defendant acted or knew it was acting unreasonably.  Plaintiff must prove both conduct and knowledge to show Defendant acted in bad faith in how it processed Plaintiff's claim.

In *Zilisch*, the plaintiff showed evidence of systematically unreasonable conduct on the part of the insurer.  In this case, Plaintiff has offered no such evidence.  Plaintiff merely argues that bad faith is proven because Santilli hired an orthopedic surgeon with 25 years of experience that has been hired by defendant insurers before and because Santilli spoke with neither Plaintiff nor Dr. Dungy while making his evaluation.  The Court finds this conduct does not rise to the level of unreasonableness displayed in *Zilisch*, where the insurer set arbitrary goals for the reduction of claims paid and the insurer based salaries and bonuses paid to claims representatives on how much the representatives paid out on

claims.  Plaintiff has offered no examples to the contrary, illustrating that conduct similar to Defendant's has satisfied a bad faith claim before and shown an insurer acted unreasonably, nor has the Court found case law to support Plaintiff's argument.   As discussed above, Plaintiff's counsel even admits that the law has not advanced to this point. Consequently, Defendant's conduct was neither objectively nor subjectively unreasonable. The Court finds the evidence that Plaintiff has proffered to show that Defendant acted unreasonably and is guilty of bad faith is merely colorable and is not significantly probative.  Therefore, the Court grants Defendant's Motion.

**IV.    CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that Defendant's Motion for Partial Summary Judgment (Doc. 65) on Plaintiff's bad faith claim is granted.

Dated this 15th day of July, 2013.

James A. Teilborg
Senior United States District Judge